**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RICHARD P. ARTHUR, | ) | CASE NO. 3:16CV00765 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES G. CARR |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Richard P. Arthur ("Plaintiff" or "Arthur"), challenges the final decision of

Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"),

denying her applications for Period of Disability ("POD"), Disability Insurance Benefits

("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate

Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the

Commissioner's final decision be AFFIRMED.

## I.  PROCEDURAL HISTORY

On May 3, 2012, Arthur filed applications for POD, DIB, and SSI, alleging a disability

onset date of August 31, 2007, and claiming he was disabled due to both physical and mental

impairments.  (Transcript ("Tr.") 237, 246).  The applications were denied initially and upon

1

reconsideration, and Arthur requested a hearing before an administrative law judge ("ALJ").

(Tr.174, 178, 185, 192, 200).

On August 5, 2013, an ALJ held a hearing, during which Plaintiff, represented by counsel, and an impartial vocational expert ("VE"), testified.  (Tr. 34).  A written Request to Reopen prior disability cases had been filed prior to the hearing, but was never entered into the record by Social Security as an exhibit; this request was made orally at the hearing and was considered by the Administrative Law Judge. (Tr. 40).  On September 16, 2014, the ALJ issued a written decision finding Arthur was not disabled.  (Tr. 9).  The ALJ' s decision became final on January 27, 2015, when the Appeals Council declined further review.  (Tr. 1).

On March 28, 2016, Arthur filed his complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 10, 12).  Plaintiff  asserts the following assignments of error:

(1)  Whether the Commissioner's finding that Mr. Arthur has the residual functional capacity to perform light work and can obtain work as a "garment sorter, photocopying maching operator or marker" is based on substantial evidence.

(2)  Whether the Commissioner erred as a matter of law in evaluating the medical opinions of record.

(Doc. No. 10 at 1).

## II.   EVIDENCE

### A.    Personal and Vocational Evidence

Plaintiff was 54 years old at the time of his administrative hearing, making him a person closely approaching advanced age under social security regulations.  (Tr. Tr. 88).  Plaintiff completed schooling through the tenth grade.  (Tr. 41).  Plaintiff and is able to communicate in

English.  (*Id.*)  He has past relevant work as a forklift operator and as a delivery man.  (Tr. 45-53).

**B.**    **Medical Evidence**

**1. Coronary Artery Disease**

Arthur has a history of coronary artery disease status post stent placement and chest pain. (Tr. 319, 364).  On May 28, 2010, a CT scan of Plaintiff's chest revealed calcific atheromatous changes of the thoracic aorta and coronary arteries.  (Tr. 328).  There was no thoracic aortic aneurysm or dissection.  (*Id.*).  On September 7, 2010, Plaintiff presented to an emergency physician with complaints of constant left-sided chest pain, but he was pain free at the time of his visit.  (Tr. 365).  He was assessed with recurrent substernal chest pain with known coronary artery diseases and elevated cardiac enzymes.  (Tr. 365).  Plaintiff was admitted to the hospital; serial cardiac enzymes were ordered; and treatment included aspirin and subcutaneous Lovenox with nitrates.  (Tr. 365).

On September 9, 2010, the cardiac cath lab performed a number of procedures, including a coronary angiography which revealed 20-30% plaquing of the left anterior descending and a distal 40-50% stenosis following the stent with diffuse distal 30-40% plaquing.  (Tr. 360). Recommendations included medical management for probable noncardiac chest pain with aggressive risk factor modification to prevent progression of Plaintiff's coronary heart disease. (Tr. 360).

**2. Neck and Back**

Plaintiff also had a history of back and neck problems.  On August 4, 2008, after a diagnosis of cervical stenosis with herniated discs, Plaintiff had neck surgery.  (Tr. 437).

3

Plaintiff was also diagnosed with lumbar stenosis, lumbar heriated nucleus pulposus, and lumbar degenerative disease.  (Tr. 437).

April 3, 2009, after conservative therapy had failed, Plaintiff had back surgery which included L4-5 and L5-S1 laminectomies, medial facetectomies, and bilateral foraminotomies. (Tr. 779-781).  Plaintiff also had multiple fusions including posterior interbody fusions, posterolateral arthrodesis, and an L4-S1 internal fixation with Theken rod system.  (*Id.*)  On April 4, 2009, Plaintiff had a post-operative evaluation, and his physician, while observing diffuse degenerative disc disease changes, noted a satisfactory post-operative appearance of the lumbar spine.  (Tr. 793).

On December 3, 2009, Plaintiff had an MRI of the lumbar spine which showed

L5-S1: Findings of prior laminectomy.  There is minimal flattening of the thecal sac secondary to the small postsurgical laminectomy bed fluid collection.  There is enhancing scar tissue surrounding the thecal sac.  No significant stenosis is identified of the central canal.  The neural foramina are obscured secondary to artifact.

L4 LS: Findings of laminectomy.  There is a small  amount of enhancing scar tissue surrounding the thecal sac.  There is no significant stenosis of the central canal.  The neural foramina are obscured secondary to artifact, though no high-grade stenosis is suspected.

L3-L4:  There is a mild broad-based disc protrusion asummetric to the right.  There is also mild facet arthropathy.  This and grade 1 retrolisthesis at this level results in narrowing of the AP thecal sac dimension to 7.5 mm.  There is no high-grade neural foraminal stenosis.

L2-L3: Mild broad-based disc protrusion and mild facet arthropathy. There is mild narrowing of the thecal sac to an AP diameter to 9 mm.  There is no significant neural foraminal stenosis.

(Tr. 774-75).  An MRI of the cervical spine showed

C5-C1:  Diffuse disc osteophyte complex and small bilateral uncovertebral osteophytes. Mild to moderate facet arthropathy.  There is effacement of the subarachnoid space. There is at least moderate bilateral neural foraminal stenosis.

4

C6-C1: No significant central canal or neural foraminal stenosis

C7-T1:  No significant central canal stenosis.  There is mild to moderate right neural foraminal stenosis.

(Tr. 777).

On May 28, 2010, a CT scan of Plaintiff's thoracic spine showed anterior osteophytes. (Tr. 328).  On June 1, 2011, Plaintiff presented at Smith Clinic Pain Management Department and he reported pain intensity at a 7 or 8 on a scale of 10.  (Tr. 411).  Medical records from May 11, 2011 show a diagnosis of lumbar post-laminectomy syndrome.  (Tr. 416).

On March 22, 2012, Plaintiff presented to Betty Mitchell, M.D., his treating physician, for hospital follow-up for chest pain.  (Tr. 667).  All Plaintiff's tests were negative.  (*Id.*). Plaintiff thought his chest pain was stress related.  (*Id.*).  However, Plaintiff reported that he had no chest pain or shortness of breath at the time of the visit.  (*Id.*).  Plaintiff complained of left foot pain.  (*Id.*).

On April 24, 2012, Plaintiff presented to Dr. Mitchell with complaints of left hand numbness and pain, and pain in his left foot.  (Tr. 664).  Plaintiff endorsed constant pain and requested an increase in pain medication, as Vicodin was not helping.  (*Id.*).  Plaintiff was referred to Dr. Eboh for pain medication consult and to Dr. Kumpf for carpal tunnel consult. (*Id.*).

On May 14, 2012, Noel N. Eboh, M.D., noted that Plaintiff's examination showed significant restriction in range of motion of his neck.  (Tr. 459).  Dr. Eboh advised Plaintiff that his continued use of his neck has led to progressive degeneration of the disc above and below the fusion site.  (*Id.*).  Dr. Eboh counseled plaintiff that there was no surgical treatment that would solve the problem.  (*Id.*).  Instead, Dr. Eboh noted that plaintiff would have to avoid working

5

above eye level, turning his neck repeatedly, or any other activities that would exacerbate his condition.  (*Id.*).

On June 12, 2012, Plaintiff presented to Dr. Mitchell with multiple complaints.  Plaintiff noted an upcoming surgery for carpal tunnel.  (Tr. 658).  He was doing well with his blood pressure medications, and he was taking NSAIDs at home for his neck pain.  (*Id.*).  Plaintiff reported no chest pain and no shortness of breath.  Plaintiff also reported an arrest for DUI.  (*Id.*).

On July 5, 2012, Dr. Mitchell cleared Plaintiff for carpal tunnel surgery, noting that Plaintiff is overall in good health.  (Tr. 655).  She noted back and joint pain secondary to arthritis.  (*Id.*).

On July 24, 2012, Plaintiff presented to Dr. Mitchell requesting physical therapy for lower back and neck pain and stiffness due to arthritis.  It was noted that Plaintiff's back pain was worse since he stopped taking Motrin.  (Tr. 652).  Dr. Mitchell noted a limited range of motion of the neck and back due to pain and stiffness.  (Tr. 654).  On September 13, 2012, Plaintiff presented to Dr. Mitchell and stated that he was doing well, but complained of a tension headache.  (Tr. 646).

On October 4, 2012, Plaintiff presented to Dr. Mitchell.  (Tr. 643).  His blood pressure was doing well at that time.  He complained of back and hip pain and pain from arthritis.  (*Id.*).  Dr. Mitchell noted there was no joint swelling and no injury, but that his pain was worse with activity.  (*Id.*).  Plaintiff indicated that his pain comes and goes.  (*Id.*).  Plaintiff was not tolerating side effects of Ambien.  (*Id.*).

On November 6, 2012, Plaintiff presented to Dr. Mitchell and reported that he was doing well with Elavil (Amitripyline) and that he was "walking a lot lately."  (Tr. 640).  Plaintiff was

6

experiencing no chest pains, no shortness of breath, and his depression was doing well.  (*Id.*).  On examination, Dr. Mitchell noted normal neuro/motor function; normal gait, no edema, and normal mood/affect.  (Tr. 641).  On December 26, 2012, Plaintiff was assessed with stable minimal disc space narrowing at L2-L3 and L3-L4. (Tr. 678, 750).

On July 19, 2013, imaging of the cervical spine revealed no acute or unstable cervical spine finding; intact anterior cervical fusion plate with intervertebral spacers at C4-C7 levels; and minor disc degenerative changes above and below fusion.  (Tr. 856).

A February 17, 2014 x-ray showed minor diffuse thoracic degenerative changes.  (Tr. 858).  Also noted were mild chronic changes of diffuse idiopathic skeletal hyperostosis (DISH) with multilevel bridging osteophyte formation.  (*Id.*).

## C.     Medical Source Opinions

On February 26, 2010, Plaintiff's neurosurgeon Christian Bonasso, M.D., reviewed an MRI image of Plaintiff's neck and noted normal postoperative changes.  (Tr. 905).  Dr. Bonasso observed that Plaintiff was having headaches but that they seemed to be under control; that Plaintiff's main issue is left lower extremity pain, mostly in his thigh, but also in his left great toe; that the surgical area from L4 to S1 looked good, but there is some epidural fibrosis; and that Plaintiff might have a synovial cyst on the left side at L3-L4.  Dr. Bonasso recommended additional diagnostic testing.  (Tr. 905).  The doctor also noted that given the severity of Plaintiff's neck and back pain, he completely supported Plaintiff's application for disability.  (Tr. 905).

On June 22, 2012, physical therapist Todd McClay prepared a functional capacity evaluation (FCE) of Plaintiff, which was reviewed by Plaintiff's treating physician, Dr. Mitchell.

(Tr. 510).  According to the FCE, Plaintiff has an inability to climb ladders, crawl, or kneel; decreased ability to reach, carry, push/pull, lift, squat, stoop/bend; decreased function for sitting, standing, walking, and stair climbing; and decreased ability to work.  (*Id.*).

In August 2012, Don McIntire, Ph.D., completed a psychological evaluation of Plaintiff at the request of the state agency.  (Tr. 523-31).  Plaintiff reported that he was separated from his wife and that he had been living with his sister and her husband for the previous two months. (Tr. 524).  Plaintiff said he did not get along with family members besides his sister and her husband; that he did not socialize with friends; and that he has no contact with neighbors. Plaintiff stated that he feels anxious and self-conscious in public; that he feels trapped when in a group; that he is afraid of enclosed spaces; and that he may have panic attacks.  (Tr. 525). Plaintiff said that he attended counseling but was not currently seeing a psychiatrist.  (Tr. 525-26).  Plaintiff claimed that he sees deceased individuals moving quickly in front of him from time to time.  Plaintiff told Dr. McIntire that as a child he had been in the children's hospital for two weeks because he was a "hateful kid."  He saw several psychiatrists as a teenager. Plaintiff started drinking alcohol at age 12, and he was drinking heavily by age 16.  Plaintiff also used cocaine, LSD, marijuana, and pain pills.  He stated that he quit using substances and now attends Alcoholics Anonymous meetings.  (Tr. 526).

On mental status examination, Plaintiff had no difficulty comprehending questions or expressing himself.  (Tr. 526).  He provided complete answers to all question without unnecessary digression, and he was able to initiate conversation and exhibit a full range of inflections.  Plaintiff presented with a normal range of emotions, but he had mood swings with a depressive mood characterized by crying spells, irritability, and an explosive temper.  (Tr. 527).

8

It was noted that Plaintiff was socially withdrawn; overly focused on the negative aspects of ongoing events and on past negative events.  (Tr. 527).  Plaintiff reportedly engaged in obsessive self-deprecating thinking; and had mixed phases where he was agitated and restless with periods of euphoria.  (Tr. 526-27).  Plaintiff reported symptoms of anxiety and may have experienced hallucinations but he did not exhibit delusional thinking.  (Tr. 527).  Plaintiff reportedly had compulsive cognitions but his thinking was lucid and logical.  (Tr. 527).  He had no major difficulties with long-term memory and he gave adequate dates and details.  (Tr. 527).

Dr. McIntire diagnosed bipolar I disorder, severe with psychotic features, post-traumatic stress disorder, generalized anxiety disorder, panic disorder with agoraphobia, obsessive compulsive disorder, alcohol dependence, in early remission, and poly-substance dependence, in remission.  (Tr. 530).  Dr. McIntire opined that Plaintiff had fair ability to understand, remember and follow basic instructions, to maintain attention and concentration to perform simple, repetitive tasks and to get along with coworkers, and had limited ability to manage stress (Tr. 530-31).

In August 2012, Diane Manos, M.D., a state agency physician, and Caroline Lewin, Ph.D., a state agency psychologist, reviewed the record evidence.  (Tr. 88-105, 106-23).  Dr. Manos opined that Plaintiff could perform a range of light work that entailed lifting and/or carrying 20 pounds occasionally and 10 pounds frequently; sitting about 6 hours in an 8-hour workday; standing and/or walking about 6 hours in an 8-hour workday; and pushing and/or pulling consistent with his ability to lift and/or carry.  (Tr. 98).  She opined that Plaintiff could occasionally climb ramps/stairs, stoop, kneel, crouch, and crawl; never climb ladders/ropes/scaffolds; frequently balance; occasionally perform handling and fingering with

9

his left upper extremity; and occasionally perform overhead reaching.  (Tr. 98-99).  Dr. Manos also opined that Plaintiff had some environmental restrictions.  (Tr. 99-100).

Dr. Lewin opined that Plaintiff could understand and remember simple repetitive and some familiar multi-step tasks in a setting without demands for fast pace or high production; was capable of occasional and superficial social interactions; and could perform work duties that were predictable and relatively static.  (Tr. 100-02).

In January 2013, on reconsideration, Maureen Gallagher, D.O., M.P.H., a state agency physician, and Janet Souder, Psy.D. a state agency psychologist, reviewed the record evidence.  (Tr. 126-48, 149-71).  Dr. Gallagher opined that Plaintiff had similar limitations to those in Dr. Manos' opinion with a few exceptions, including that Plaintiff could never crawl.  (Tr. 140-42).  Dr. Souder opined that Plaintiff had similar limitations to those in Dr. Lewin's opinion with a few exceptions including that Plaintiff would do best in a setting that does not require him to work closely with others and would likely do best with no public interaction.  (Tr.. 143-45).

In July 2013, Betty Mitchell, M.D., in a note addressed "To Whom It May Concern," stated that Plaintiff "is unable to work at this time due to his current medical condition"  (Tr.. 906).

**D.    Hearing Testimony**

During the August 5, 2014 hearing, Plaintiff testified to the following:

- Plaintiff worked as a packer for three months, and then as a tow motor driver.  (Tr 46).  As a tow motor driver, his job included some lifting, but he was never required to lift anything over 50 pounds.  (Tr. 47-48).

- Plaintiff also worked for a printing company, operating a printing press and delivering paperwork.  (Tr. 48).  Plaintiff was required to mix the ink, lift from fifty to seventy pounds, and drive a company truck.  (Tr. 49).

10

- Plaintiff worked with various employers as a tow motor driver, packer, and press operator until 2005 when he became a water deliveryman.  As a water deliveryman plaintiff was required to transport and lift water jugs and bags of salt, weighing about eighty pounds.  (Tr. 55-56).  Plaintiff quit his delivery job due to an injury to his neck and back.

- Plaintiff attended school up to the tenth grade, and the only other training he ever received was as a printing press operator.  (Tr. 57)

- Plaintiff testified that he lived at home with another adult, and did work around the house that included cooking, doing the dishes, driving, and folding laundry.  (Tr. 57-58).  Plaintiff said he was unable to vacuum without pain and was completely incapable of mopping.  (Tr. 57-58).  Plaintiff babysits his children for a few hours at a time every few months.  (Tr. 58).

- Plaintiff attempted to obtain his GED but he missed classes due to his back surgeries.  (Tr. 63).  He later tried to continue with the classes, but, because he was homeless at the time, was unable to access the required resources.  (Tr. 63-64).

- Plaintiff testified that he has carpal tunnel and cubital tunnel release and that he takes Norco and Soma three times a day to help with the pain.  (Tr. 64, 67).  Plaintiff asserted that most of the pain originated in his neck, but he also has pain in his left leg and both arms.  (Tr. 67).  On a scale of zero to ten, Plaintiff rated his pain at a seven or eight.  (Tr. 67).  Even with pain medication, his pain does not drop below a six.  (Tr. 67).

- Plaintiff said he tried walking in the evenings, but was only able to walk about a quarter of a mile.  He complained of pain in his feet and trouble breathing.  (Tr. 68).  Plaintiff said that his previous exercise regimen of walking three miles and lifting weights worsened his symptoms, especially those relating to his neck and his headaches.  (Tr. 69).

- Plaintiff testified that he had about one to two headaches a day, each lasting around forty-five minutes.  (Tr. 69-70).  He rated the pain intensity at about a six.  (Tr. 69).  Plaintiff's headaches are aggravated by stress and even simple chores such as sweeping or lifting laundry.  (Tr. 70).  Sometimes they occur without a trigger.  (Tr. 70).

- Plaintiff also has trouble gripping.  (Tr. 71).  He testified that he had recently dropped coffee cups and plates quite a few times.  (Tr. 71).

- Plaintiff's leg goes numb if he walks for any period of time.  (Tr. 71).  Plaintiff has stumbled and fallen a few times.  (Tr. 71).

- Because Plaintiff has difficulty turning his head, he does not feel comfortable driving.  Thus, his daughter typically drives him to appointments.  (Tr. 72).

- Since 2010, Plaintiff has from time to time been homeless, because he has had difficulty obtaining resources to find a home.  (Tr. 72).

- Plaintiff sought help of Job and Family Services to find a job, but he was unable to pass the physical for one of the jobs.  He also applied for a job in a department store, but he was unable to lift required amount of 25 to 50 pounds. (Tr. 73-74).

- Plaintiff was taking the sleep medication amitriptyline.  (Tr. 74).

- Plaintiff did not have any current cancers but he previously had a partial nephrectomy and an appendectomy as part of a previous cancer.  Plaintiff complained of continuing problems with his kidneys.  (Tr. 75).  In order to avoid kidney pain, Plaintiff must keep his kidneys well flushed.  His doctors advised him there is an 85 percent chance of his cancer returning.  (Tr. 75).

The VE testified Plaintiff had past work as a Tow Motor Operator, Printing Press

Operator, and Delivery Driver.  (Tr. 25, 55)  The ALJ then posed the following hypothetical

question:

[A]ssume that our hypothetical individual would be capable of lifting and carrying a maximum of 20 pounds occasionally, and ten pounds frequently. Of standing and walking six of eight hours in an eight-hour day, and sitting six of eight hours in an eight-hour day. Assume our hypothetical person could use all extremities to push and pull without limitation except to the extent frequency and weight restricted [ ] his capacity to lift and carry.  Assume that he could handle, finger and feel without limitation. Assume that he could perform lateral and frontal reaching without limitation. Assume that he could frequently balance. Assume that he could occasionally climb ramps and stairs, occasionally stoop, kneel, crouch, and occasionally perform overhead reaching. Assume our hypothetical person could perform work that did not require that he climb ladders, ropes or scaffolds, crawl, be exposed to unprotected heights or to hazardous machinery. Assume that he could perform work that did not require constant rate of exposure to temperature or humidity extremes, to airborne respiratory irritants, or to vibration. Assume further that our hypothetical person would be capable of understanding, remembering and following instructions necessary to complete simple, routine, repetitive tasks, and some non-familiar multi-step as in three to four-step tasks.  Assume that he would do best in a setting that would not require him to work closely with others.

12

Assume that he would do best in a setting without strict time or production demands. Assume that he would retain the capacity for occasional superficial social interactions . Assume that he would do best with no public interaction, but would not be incapable of public interaction.  Assume finally that he could perform work duties that would be predictable in a relatively static work setting.

Under the provisions of this hypothetical question, could our hypothetical person perform the claimant's past work activity, or some portion of it, either as he performed it or as it would be typically performed in accordance with the definition in the Dictionary of Occupational Titles?

The VE testified the hypothetical individual would not be able to perform past work as a Tow Motor Operator, Printing Press Operator, and Delivery Driver.  (Tr. 78).  However, the VE explained the hypothetical individual would be able to perform other representative jobs in the economy, such as Garment Sorter, Photocopying Machine Operator, Sorter, and Document Preparer.  (Tr. 78-79).

## III.  STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a

13

claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).   Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Plaintiff was insured on his alleged disability onset date, August 31, 2007 and remained insured through December 31, 2012.  Therefore, in order to be entitled to POD and

14

DIB, Plaintiff must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.

2. The claimant has not engaged in substantial gainful activity since August 31, 2007, the alleged onset date (20 CFR 404.1571, et seq., and 416.971, et seq.).

3. The claimant has the following severe impairments: a personality disorder; a bipolar disorder; a history of moderately severe left carpal tunnel syndrome, status post release; an anxiety disorder, variously characterized as a post-traumatic disorder, a generalized anxiety disorder and a panic disorder with agoraphobia; an obsessive compulsive disorder; a status post lumbosacral laminectomy and fusion with instrumentation; a history of left cubital tunnel syndrome, status post release; a history of coronary artery disease, status post arterial stenting; a status post anterior fusion plate with intervertebral spacers at C4-C7 levels; early degenerative changes of the light hip, and asthma  (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1(20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the  entire record, I find that the claimant has the residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently. He can sit, stand, and/or walk for 6 hours of an 8-hour workday. His ability to perform pushing and pulling activities is unlimited, subject to frequency and weight restrictions set forth above regarding his capacity to lift/carry. He is unlimited in his ability to handle, finger, feel, and to perform lateral and frontal reaching. He can frequently balance.  He can occasionally climb ramps and stairs, stoop, kneel, crouch, and perform overhead reaching.  He is capable of work that does not require him to climb ladders, ropes, or scaffolds, to crawl, or to be exposed to hazardous machinery or unprotected heights.  He is capable of work that does not require concentrated exposure to temperature or humidity extremes, airborne respiratory irritants, or

vibration. He can understand, remember, and follow instructions necessary to complete simple, repetitive tasks and some non-familiar multi-step (3-4 step) tasks. He would do best in a setting that does not require him to work in close proximity with others. He would do best in a setting without strict time or production demands. He retains the capacity for occasional and superficial social interactions. He would likely do best with no public interaction, but he is capable of such interaction. He can perform work duties that are predictable in a relatively static work setting.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on July 17, 1960 and was 47 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from August 31, 2007, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 14-27).

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to

proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the

regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### A. Treating Physician Rule

Plaintiff maintains that the ALJ erred by failing to provide good reasons for giving no weight to the medical opinion of treating physician Dr. Mitchell and little weight to the opinion of Dr. Bonasso.

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Meece v. Barnhart*,

18

2006 WL 2271336 at * 4 (6th Cir. Aug. 8, 2006); 20 C.F.R. § 404.1527(c)(2).  However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (quoting Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 2006 WL 2271336 at * 4 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.)  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927."  *Blakley*, 581 F.3d at 408.

 If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5).  See also Gayheart, 710 F.3d at 376.  The purpose of this requirement is two-fold.  First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'"  *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule."  *Wilson*, 378 F.3d at 544.  Because of the significance of this requirement, the Sixth Circuit has held that the failure to

19

articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

       With respect to Dr. Mitchell, Plaintiff argues the ALJ failed to give proper weight to a functional capacity evaluation ("FCE") dated June 22, 2012 (Exhibit 13F in the Administrative Record). However, this FCE appears to have been prepared not by Dr. Mitchell, but by a physical therapist, Todd McClay. (Tr. 501-510). Plaintiff, the Commissioner, and the ALJ all seem to interpret the FCE as the medical opinion of Dr. Mitchell, but it is not clear on what basis they do so, since the FCE is signed by Mr. McClay and includes a notation showing that Dr. Mitchell merely *reviewed* the evaluation. (Tr. 510). There is no indication that Dr. Mitchell contributed to its preparation. Nor do the parties point to any evidence to show that Dr. Mitchell adopted the physical therapist's findings.

       On this basis alone, Plaintiff's argument relating to Dr. Mitchell should be rejected. Since it is evident that the relevant opinion (Exhibit 13F of the Administrative Record) was prepared by a physical therapist and not a treating physician, the treating physician rule does not apply. *See Pyotsia v. Astrue*, No. 1:12-CV-00959, 2013 WL 101932, at *6 (N.D. Ohio Jan. 8, 2013) ("[A] physical therapist is an 'other source' pursuant to 20 C.F.R. § 416.913(d)(1), which is not subject to the 'good reasons' requirement of the treating physician rule."). Therefore, the ALJ was not required to explain his reasoning in the manner mandated by the treating physician rule.

       Further, assuming *arguendo* the opinion contained in the FCE dated June 22, 2012 is attributable to Plaintiff's treating physician, Dr. Mitchell, the ALJ complied with the treating

physician rule by providing good reasons for affording the opinion less than controlling weight.

According to the FCE, Plaintiff cannot climb ladders, crawl or kneel; had a decreased ability to

reach, carry, push/pull, lift, squat, stoop, bend, sit, stand, walk or climb stairs; and had a

decreased ability to work.  (Tr. 510).  The ALJ gave no weight to this opinion because

> it does not provide a clear function-by-function analysis of the claimant's abilities, it is inconsistent with the doctor's own treatment notes, which indicate mostly benign findings, and it completely duplicates the assessment of a physical therapist to whom the doctor had referred the claimant for a functional capacity assessment.  I gave that assessment, set forth at Exhibit 13F, no weight because a physical therapist is not an acceptable medical source, and his assessment was based a one-time evaluation, rather than on a history of treatment with the claimant. Finally, his findings are inconsistent with the totality of the evidence, including the claimant's reported activities of daily living.

(Tr. 23).

The Court agrees with the Commissioner that the absence of "a clear function-by-

function analysis" in the FCE is a "good reason" for rejecting the limitations to which Dr.

Mitchell purportedly opined.  While the FCE notes a "decreased ability" to perform a number of

functions, it provides no specifics as to the duration or frequency that Plaintiff is capable of

performing the listed activities.  Without specific time limitations on, for example, Plaintiff's

ability to stand or walk, the FCE does not meaningfully bear on the analysis relating to

Plaintiff's residual functional capacity.  In general, when assigning a residual functional

capacity, an ALJ considers the length of time that a claimant is capable of standing or walking.

For instance, to be deemed capable of a full range of "light work," a claimant must be able to

"stand[ ] or walk[ ], off and on, for a total of approximately 6 hours of an 8-hour workday."  SSR

83-10.  In this case, the FCE notes a "decreased ability" to stand or walk but fails to offer any

specific durational limitations.  Plaintiff does not explain how, assuming the ALJ accepted the

FCE, a "decreased ability" to perform the various activities would affect the assigned RFC. Therefore, the ALJ did not err by discounting the FCE on this basis.

The ALJ further pointed out that the limitations described in the FCE are inconsistent with Plaintiff's reported activities of daily living.  (Tr. 23).  The ALJ adequately supported this assertion, citing to evidence that Plaintiff had been out to "check out his fishing spot and find some mushrooms"; that he was "doing well and walking a lot, which helps his joint pain"; that he "had been walking three miles per day; that his blood pressure was doing well on medication"; that he "had not experienced chest pain or shortness of breath; and that his depression was doing well."  (Tr. 21).

The ALJ also noted that the opinion contained in FCE was inconsistent with Dr. Mitchell's treatment notes.  The ALJ did not, but should have, cited specific instances in the record that demonstrate the inconsistencies.  *See Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 552 (6th Cir. 2010) ("[I]t is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick.").  However, in this instance, the ALJ's failure to discuss specific discrepancies does not amount to reversible error.  The absence of "a clear function-by-function analysis" and the inconsistency with the record discussed above were sufficient bases to reject the opinion contained in the FCE.

In sum, the ALJ did not violate the treating physician rule when he assigned no weight to the FCE, because the FCE was prepared by a physical therapist and not the treating physician. The treating physician rule does not apply to the opinion of a physical therapist.  Alternatively,

assuming the FCE is attributable to Plaintiff's treating physician, the ALJ provided "good

reasons" for assigning the weight he did.

Next, Plaintiff argues that the ALJ failed to provide good reasons for assigning little

weight to the opinion of Plaintiff's neurosurgeon, Dr. Christian Bonasso.  In a consultation letter

dated February 26, 2010, Dr. Bonasso wrote the following:

> I had the opportunity to talk with Mr. Arthur today regarding his recent MRI scanning.
> MRI scan of the neck shows normal postoperative changes.  He does have some
> headaches, but these seem to be under control for the most part. His main issue is left
> lower extremity pain.  It is mostly in his thigh, but he does have pain in his left great
> toe.  The surgical area from L4 to SI looks good, but there is some epidural fibrosis.  On
> the left side at L3-L4 he may have a synoval cyst although is very difficult to say.
> Given those findings, I would like to get a CT myelogram of his lumbar spine and an
> EMG of his left leg. I am going to set this up for him as soon as possible and I will send
> you an updated letter at that time. Please call me if you have any questions, and I thank
> you very much for allowing me to participate in his care.  Also Mr. Arthur is applying
> for disability. Given the severity of his neck and low back issues, I completely support
> this, and I encouraged him to apply for disability. Please call me if you have any
> questions.

(Tr. 905).

While recognizing that Dr. Bonasso is a treating source, the ALJ gave this his opinion

little weight because

> when asked for updated information in the current claim, Dr. Bonasso indicated that he
> had not seen the claimant for a protracted period and had no information to provide. To
> the extent that he discussed the claimant's neck pain, it was in the context of headaches,
> which he indicated were under control. The report references complaints of left thigh
> and great toe pain of questionable etiology, in spite of the fact that the "surgical area
> from L4 to S1 looks good", [ ] more testing was recommended. That testing was
> subsequently performed and it fails to corroborate pathology reasonably expected to
> cause disabling upper or lower spinal complaints. Specifically, lumbar spine x-rays
> taken in December 2012 showed intact posterior fusion rods with laminectomy changes,
> and stable minimal disc space narrowing (see Exhibits 22F and 25F). Cervical spine x-
> rays performed in July 2013 and January 2014 showed "no acute or unstable cervical
> spine findings" (Exhibit 35F), "minor" disc degenerative changes (Id.), and "mild"
> upper cervical disc degeneration at C3-4  (Exhibit 38F).

Further, Dr. Bonasso's opinion offers no function-by-function limitations, and it offers an opinion on the ultimate issue of disability, which is reserved to the Commissioner of the Social Security Administration. Finally, the claimant's activities of daily living, including walking three miles per day and lifting 25-pound weights regularly as part of his exercise regimen, are inconsistent with complete disability.

(Tr. 24-25).

Plaintiff asserts that the ALJ failed to provide *any* reasons for discounting Dr. Bonasso's opinion. (Doc. 10 at 17). The Court disagrees. The ALJ provided a number of sufficiently clear, legitimate reasons for assigning little weight to Dr. Bonasso's opinion. First, as with the opinion of Dr. Mitchell, the ALJ points out that Dr. Bonasso provided no "function-by-function limitations." For the same reasons discussed above in relation to Dr. Mitchell's opinion, the absence of "function-by-function limitations" supports a decision to assign less than controlling weight to Dr. Bonasso's opinion. Moreover, as noted by the ALJ, the fact that Dr. Bonasso encouraged Plaintiff to apply for disability is not a medical opinion under the regulations, as it goes to the ultimate issue of disability, which is a matter reserved for the Commissioner. *Littleton v. Comm'r of Soc. Sec.*, No. 5:12 CV 2756, 2013 WL 6090816, at *9 (N.D. Ohio Nov. 19, 2013) (citing 20 C.F.R. § 404.1527(d)(1)) ("The question of whether a claimant is disabled is an issue expressly reserved for the Commissioner and does not constitute a medical opinion.").

The ALJ also pointed out that certain aspects indicated relatively normal findings and others were inconclusive. (Tr. 24). For instance, Dr. Bonasso's review of Plaintiff's MRI showed "normal postoperative changes"; that Plaintiff's headaches were under control for the most part; that the surgical area of L4 to S1 "looked good"; and that because it was unclear whether Plaintiff had a synoval cyst, further testing was required. (Tr. 24). The ALJ also noted

24

that subsequent testing undermined Plaintiff's claims of severe impairment.  (*Id.*).  While Dr. Bonasso noted Plaintiff's primary problem was left lower extremity pain, the ALJ justifiably discounted Dr. Bonasso's opinion in light of an absence of objective evidence to support it.  *See* 20 C.F.R. § 404.1527(c)(3)("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.").

In sum, the ALJ provided sufficiently clear reasons for assigning less than controlling weight to the opinions of Dr. Bonasso and Dr. Mitchell.

### B. Selective citation of the evidence

Plaintiff argues that the ALJ selectively cited the record in weighing the medical source opinions and overlooked certain pieces of evidence, noting in particular an x-ray from 2009 and CT scans from 2012 and 2014.  (Doc. 10 at 16).  An ALJ is not obligated to discuss every piece of evidence in the record.  *Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004). In this case, it is apparent that the ALJ did consider the March 2012 CT scan which showed stable post-surgical changes from C4 to C7, with no acute process.  He also considered cervical x-rays performed in July 2013 and January 2014, which showed "no acute or unstable cervical spine findings," minor disc degenerative changes, and mild upper cervical disc degeneration. (Tr. 24).  While the ALJ did not explicitly discuss the 2014 CT scan, which showed the presence of anterior osteophytes, Plaintiff fails to explain how his failure to do so undermines the ALJ's conclusion.

25

### C.      Whether Plaintiff's RFC is based on substantial evidence

Plaintiff contends that the ALJ's finding that he is capable of light work is not based on substantial evidence, noting that light work requires "standing or walking, off and on, for a total of approximately 6 hours of an 8-hour work day."  SSR 83-10.  First, Plaintiff asserts that the opinions of neither Dr. Mitchell nor Dr. Bonasso support the finding that Plaintiff is capable of light work. As discussed above, it was not error for the ALJ to discount these physician's opinions.  Thus, their opinions are largely irrelevant to the RFC determination.

Plaintiff next takes issue with the ALJ's decision to assign significant weight to the opinions of the state agency examiners, arguing that it was improper to do so because the examiners "are not doctors."  This is incorrect.  The state agency examiners are doctors.  (See Tr. 88-105, 106-23).

Finally, Plaintiff mentions, without any elaboration, that the ALJ cited no medical evidence to support his RFC assessment.  (Doc. No. 10 at 13).  Plaintiff's treatment of this issue is far too superficial to allow for meaningful consideration by the Court.  "It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones."  *McPherson v. Kelsey*, 125 F.3d 989, 995B96 (6th Cir.1997) (quoting *Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 293B94 (1st Cir.1995)).  On review, the ALJ's opinion shows he formulated an RFC based on consideration of the record evidence as a whole.

26

## VII.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.


_s/Jonathan D. Greenberg_
Jonathan D. Greenberg
United States Magistrate Judge

Date: January 18, 2016


## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**

27